Carter C. White, State Bar No. 164149
UC Davis Civil Rights Clinic
One Shields Avenue, Bldg. TB 30
Telephone: (530) 752-5440
Fax: (530) 752-5788
Email: ccwhite@ucdavis.edu

*Attorney for Plaintiff, Theodora Medley*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THEODORA MEDLEY,<br>Plaintiff,<br>v.<br>S. PFITZER, ET AL.,<br>Defendants. | Case No. 2:22-cv-00227-DJC-SCR<br><br>SECOND AMENDED COMPLAINT |

Plaintiff THEODORA MEDLEY complains and alleges the following:

**INTRODUCTION**

1. Theodora Medley has a well-documented and lengthy history of mental health and disability diagnoses, as California Health Care Facility, Stockton ("CHCF") officials were aware. During her incarceration at CHCF, Medley has been subjected to numerous violations of her rights, including unwanted sexual conduct by staff, indifference to medical needs, disability discrimination, and retaliation.

2. This case was initially filed in the Central District of California. Before that Court transferred the case to this district it instructed Plaintiff to "include all of their claims and Defendants relating to the present conditions at their place of incarceration" in one action to promote judicial efficiency. See ECF No. 24, at 2 in *Medley v. Pfitzer*, No. 5:21-cv-545-DOC-MAR (C.D. Cal. Jan. 6, 2022).

**JURISDICTION AND VENUE**

3. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

4. Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

**PARTIES**

5. Plaintiff THEODORA MEDLEY is, and was at all times relevant, a California state prisoner.

6. Defendant JAMES ACEVES was at all times relevant to the actions and omissions described herein a Correctional Officer at CHCF.

7. Defendant GABRIEL SORIN WILLIAMS, M.D., was at all times relevant to the actions and omissions described herein a Physician and Surgeon at CHCF.

8. Defendant HEATHER DREY, Ph.D., was at all times relevant to the actions and omissions described herein a Clinical Psychologist at CHCF.

9. Defendant ARTHUR HALL, was at all times relevant to the actions and omissions described herein a Psychologist at CHCF.

10. Defendant KIM PETERSEN, was at all times relevant to the actions and omissions described herein an ADA Coordinator at CHCF.

11. Defendant CAMELLIA MOHADJER, was at all times relevant to the actions and omissions described herein a Senior Psychologist Supervisor at CHCF.

12. Defendant L. BUCSIT, was at all times relevant to the actions and omissions described herein an ADA Analyst/Office Technician at CHCF.

13. Defendant SURESH HOSURU, M.D., was at all times relevant to the actions and omissions described herein an Internal Medicine Specialist at CHCF.

14. Defendant ELIZABETH BYERS (RND), was at all times relevant to the actions and omissions described herein a Dietician at CHCF.

15. Defendant MELANIE HENREY (RND), was at all times relevant to the actions and omissions described herein a Dietician at CHCF.

16. Defendant RONWALD VICENCIO, was at all times relevant to the actions and omissions described herein a Dietician at CHCF.

17. Defendant MCKENZIE, was at all times relevant to the actions and omissions described herein a Psychologist at CHCF.

18. Defendant FARNOOSH SAMIINIA, was at all times relevant to the actions and omissions described herein a Clinical Psychologist at CHCF.

19. At all times relevant, each and every Defendant was acting under color of state law.

## FACTUAL ALLEGATIONS

20. At all times relevant herein, Medley was incarcerated in the California Department of Corrections and Rehabilitation ("CDCR") and was serving a sentence of 25 years to life. Medley has been incarcerated in CDCR since 2000 and is scheduled to have her next parole suitability hearing in June 2027.

21. Medley has a well-documented history of mental health and disability diagnoses dating back at least to her initial incarceration in CDCR. The incidents made the basis of this lawsuit occurred at the California Health Care Facility, Stockton ("CHCF"). Officials at CHCF were at all times well aware of Plaintiff's mental health history and disability diagnoses.

22. On February 25, 2016, Medley received a mental health evaluation by the Interdisciplinary Treatment Team ("IDTT") at California Men's Colony ("CMC"). This evaluation determined that Medley "requires a single cell due to mental health reasons." This determination is consistent with prior recommendations, as Medley has previously been approved for single cell status dating as far back as April 2001 because of her psychiatric conditions.

23. Medley has a documented history of coming to Mental Health Crisis Bed ("MHCB") in response to yard stressors related to sexual situations or pressures from other inmates and staff and maladaptive and self-injurious behavior. Because of this, on February 25, 2016, the IDTT team referred Medley to the Enhanced Outpatient Program ("EOP") to alleviate stressors and halt her pattern of MHCB use.

24. CDCR transferred Medley from CMC to CHCF on or about February 29, 2016.

25. Medley began her participation in the Developmental Disability Program (DDP) at CDCR since July 20, 2015. Upon her original DDP screening, Medley was designated as a DD2, which required her to receive adaptive support that included the following: simple language and repeat/rephrase as needed to ensure understanding; one or two step instructions; frequent reminders; extra time to adjust to new situations, especially during periods of stress; assistance with reading and writing CDCR forms; calm redirection to help de-escalate situations; and monitoring of her interactions with other inmates to prevent victimization, since she is at risk for being pressured. As a DD2 she was required to be assigned housing in a designated DDP building, unit, or wing, consistent with her case factors. Medley also has physical disabilities that qualify her for a lower/bottom bunk only and she can only be housed on the ground floor of buildings.. Because Medley is transgender, intersex, and has diagnoses of Autism Spectrum Disorder, gender dysphoria, and Sensory Integration Disorder, she is vulnerable to and at risk of sexual victimization.

26. In March 2016, during Medley's intake processing at CHCF, she was designated as a DD2 and housed in the E1-Fox housing unit.

27. Medley was born intersex and as a result of this, experiences Congenital Adrenal Hyperplasia ("CAH"). To achieve sufficient sodium and potassium levels to function, Medley requires nutritional accommodations. Due to this Medley frequently experiences significant weight loss and issues maintaining her weight. Following multiple meetings with dieticians, in 2016 Medley was prescribed the Liquid Nutritional Supplement ("LNS"), Glucerna 1.5 to be taken four times daily to accommodate her IBS-C, Autism, CAH, and other food intolerances.

28. When Medley is at a low weight or does not receive sufficient caloric intake, she experiences physical symptoms that result in increased pain in her feet and hands as well as a sensation in her head that makes her feel as if she is having a seizure. Additionally, Medley describes experiencing psychological symptoms, such as increased sensory issues that impair her ability to function. She also experiences issues with her memory,

organizing her thoughts, increased impulsivity, and decreased ability to regulate her mood. This causes her to be increasingly agitated and decreases her mental stability, which makes her feel like a danger to herself.

29. As a result of the treatment plan that included Glucerna, Medley was able to gain and maintain her weight of 165 pounds or 74.8 kilograms. In her own words, Medley says that once she began receiving Glucerna "[her] body started functioning." Other LNS supplements, such as Boost and Ensure, do not have the same effect on her, as they do not sufficiently regulate her sodium and potassium levels, and they do not have as many calories so they "burn off" more quickly. Unlike other LNS, Glucerna also has Nutri flora and chromium, which are helpful for Medley's bodily functioning.

30. On or about June 29, 2016, Medley met with Gabriel Sorin Williams, M.D., for a medical examination. During the examination Williams inserted his fingers into Medley's anus without her consent. Williams attempted to justify this action by stating that Medley had inserted batteries into her anus but there was no evidence to support this contention. Medley reported that Williams had assaulted her to multiple CDCR staff members. One of the staff members told Medley that Williams' behavior was acceptable "because doctors can do physical examinations to determine sexual orientation" and they believed it was "consensual."

31. Medley filed a 602 grievance regarding the incident with Defendant Williams and the incident is referred to in an 1824 Reasonable Accommodation Request, where Medley requested to cease receiving treatment from Williams. The request was denied, and Medley has been forced to continue to receive care from Williams, which triggers her PTSD symptoms. It should be noted Williams served as one of the panelists that evaluated Medley's aforementioned Reasonable Accommodation Request, as well as many others.

32. In 2018, Medley met with Defendant Dr. Samiinia, who removed Medley's diagnosis of gender dysphoria and Autism Spectrum Disorder without providing a reason. Due to this, Medley was reclassified as a DD1 in the DDP. Due to her DDP reclassification, in September 2018, the Institution Classification Committee ("ICC") determined that

Medley did not meet the criteria to need single cell housing. Medley appealed this decision, exhausting her administrative remedies, on the basis that the ICC incorrectly categorized her because they did not review all the case factors to properly determine Medley's housing classification and that she was not provided with staff assistance during this review.

33. One week after Defendant Samiinia removed Medley's gender dysphoria and Autism Spectrum Disorder diagnoses, she reinstated them. However, Medley's classification as a DD2 was not reinstated.

34. On or about July 20, 2020, Medley was assigned Defendant Dr. Drey as her primary psychologist in the Enhanced Outpatient Program ("EOP"). Medley first met with psychologist Defendant Drey in August 2020. During their third meeting they had sexual intercourse. Medley met with Drey six times and each time they engaged in an "aggressive sexual relationship." At no time did Plaintiff give valid, lawful consent to any of the sexual contact she had with Defendant Drey.

35. Medley reported Defendant Drey's inappropriate sexual behavior to multiple staff members and informed them that she did not feel safe in a room with Defendant Drey. These included medical and custody staff. None of them intervened and Medley continued to meet regularly with Defendant Drey until September 2020. Medley contends that "everyone" knew about Drey's behavior.

36. CDCR employees have a responsibility to protect incarcerated people in their custody. According to the Department Operations Manual, "[a]ll staff are responsible for reporting immediately and confidentially to the appropriate supervisor any information that an offender is being, or has been the victim of sexual violence, staff sexual misconduct, or sexual harassment. In addition to reporting, employees have a responsibility to assist the offender and refer him/her to medical/mental health for evaluation. Staff shall ensure the reporting of information is done as soon as possible and in a confidential manner." DOM § 54040.7.

37. During their meetings, when Dr. Drey did not bring her PAD alarm Medley knew that this

meant that they were going to engage in sexual behavior. Medley says she learned a long time ago that when Drey came into the room with no alarm that meant that Drey was about to engage in aggressive "sex or violence."

38. On September 22, 2020, Medley told Drey that she wanted to end their sexual relationship. During this meeting, Drey brought her PAD alarm. Drey came around to the side of the table where Medley was seated and approached and straddled Medley. Medley reached to push the button on Drey's alarm to call for help but when Drey held it away, Medley attempted to avoid Drey's advance by self-mutilating her own neck with a razor blade that Medley had brought into the appointment in her mouth. Defendant Drey's conduct caused Medley severe psychological damage and caused her to attempt suicide in order to receive protection from Drey's sexual advances.

39. On October 5, 2020, Medley was taken to an Interdisciplinary Treatment Team meeting ("IDTT") by Defendants Drey and Hall to endorse Medley to Psychiatric Inpatient Program ("PIP") in the B-Yard Facility at CHCF as reprisal, retaliation, and cover up for staff misconduct and staff rape. Defendant Drey was aware that B-Yard was not a safe environment for Medley and intended to harm her by sending her there. Drey stated to Medley that she would have her colleagues in B-Yard "do to [Medley] what [Drey] couldn't do to [her]."

40. On October 13, 2020, with no 72-hour notice, Medley was rushed to a surprise hearing to determine whether her transfer to PIP was appropriate. Correctional Officer Valenon, John Porus, Balanon, Drey, Their, and Captain Ramiro were present at the hearing. At the hearing, the staff provided no documentation, and no witnesses and Medley was not allowed to ask questions or present evidence. Thus, no evidence was presented, and the transfer was deemed appropriate and Medley was transferred to B-Yard on December 29, 2020. For the majority of time between then and March 2022, Medley was housed in B-Yard and participated in PIP.

41. While in B-Yard, Medley experienced sexual and physical violence by other inmates, particularly due to her transgender status. She reported these incidents to the staff, but

they did not monitor Medley's interactions with other inmates to prevent victimization. Each time Medley would leave her cell other inmates pressured her to engage in sexual behavior. Since the staff did not intervene to stop these interactions, the only way Medley felt that she could protect herself from harm was to self-isolate in her cell for 23 hours each day. For several months Medley only left her cell to shower. This caused Medley to experience psychological harm and exacerbated symptoms related to her Sensory Integration Disorder, Autism Spectrum Disorder, and generally had a negative effect on her mental health. Although Medley reported this her psychiatrist, her psychologist, and multiple members of the nursing staff, she received no support.

42. Moreover, while in B-Yard, Medley was not provided with her adaptive support accommodations. Specifically, staff did not speak to her with simple language and repeat/rephrase as needed, provide her with one or two step instructions or frequent reminders, allow her extra time to adjust to new situations, assist her with reading and writing CDCR forms, or provide her with calm redirection to help de-escalate situations. On multiple occasions, Medley's requests to staff for help were ignored and she was told that they do not have time to help her. Medley contends that the staff in B-Yard was incompetent and not trained to accommodate or interact with inmates with developmental and learning disabilities. Due to this, even when she was isolated in her cell, at times she did not feel safe because the medical staff did not know how to interact with her and treated her disabilities as through she was experiencing psychosis.

43. About two weeks into her time in B-Yard, on or about January 4, 2021, Ronwald Vicencio (RND) discontinued Medley's prescription for Glucerna 1.5 and replaced it with another LNS, Ensure 1.5. Prior to this date Medley had been taking the same LNS (Glucerna) since 2018 as treatment for Medley's digestive disorder. Since Ensure has half the caloric density as Glucerna, more sugar, and made Medley feel ill, weak, and faint multiple times, which caused her to become more vulnerable to sexual victimization by other inmates.

44. On January 15, 2021, Medley was put back on the Glucerna.

45. On March 15, 2021, Medley was taken to another IDTT meeting where Defendant

Mckenzie told Medley that she could not address her rape claims against Defendant Drey.

46. On March 23, 2021, Medley met with Dr. Suresh Hosuru (PCP). A few days later, Medley was put on Ensure instead of Glucerna because it was out of stock.

47. On April 5, 2021, Medley filed an 1824 grievance because of the repeated change of Glucerna LNS, requesting for the community standard of care for her Autism Spectrum Disorder.

48. On April 7, 2021, the Reasonable Accommodation Panel ("RAP") denied her request with no acknowledgment that the LNS was a treatment for her Autism, and therefore an accommodation for her developmental disability. Defendants Hall, Williams, and Petersen were among the staff members that denied the request.

49. The next day, on April 8, 2021, Medley met with Melanie Henrey (RND), who expressed to Medley that "[she] did not know why [Medley] gets Glucerna." Medley informed Defendant Henrey that she had been receiving Glucerna since 2018 and that it was a necessary accommodation for her diagnoses of Autism Spectrum Disorder, IBS, CAH, and other digestive disorders, as well as part of her treatment plan to gain weight and maintain a healthy body weight. During this conversation, Defendant Henrey threatened to remove Medley's Glucerna's prescription because Medley filed a grievance.

50. On or about July 3, 2021, Medley was weighed at 145.5 pounds or 66 kilograms.

51. On or about July 7, 2021, Medley's Glucerna prescription expired, and she was no longer provided with Glucerna.

52. On July 11, 2021, Medley's Glucerna prescription was reinstated but instead of receiving it four times a day ("4x") as she did before, she was provided with a limited amount, receiving it twice per day ("2x") along with regular food at mealtime. Due to her Autism, IBS, and digestive issues, Medley was not able to eat the regular food and could not take her medications. During the period between July 8, 2021 and August 6, 2021, Medley made multiple requests to nursing staff to see a doctor and insisted that her Glucerna prescription be re-instated.

53. Throughout her time in B-Yard, Medley was frequently ignored by medical staff when

requesting medical attention. On multiple occasions, nurses would walk by Medley's cell, filled with pools of blood from bad nose bleeds or feces on the floor from her IBS side effects and did not provide her with any medical assistance. The nurses did not wear name tags, so Medley was not able to identify them.

54. On or about July 10, 2021, Elizabeth Byers (RND) visited Medley outside of her cell door while Medley was resting in her cell. Defendant Byers asked Medley why Medley was not eating her meals. Medley had not yet met Byers, so Medley explained to her that due to her medical conditions, she is not able to eat the foods provided and that Glucerna 4x has been her approved plan of care since 2018. Medley explained that she was not refusing to eat, but rather she could not eat most of the food provided to her. At multiple points in the conversation Medley stated she would try to eat what she could, including apples, beans, and carrots. Byers ignored Medley's explanation and informed her that she could not re-instate the Glucerna prescription if Medley "refused to eat." Throughout this interaction, Byers made multiple intimidating statements threatening to discontinue Medley's Glucerna prescription altogether, stating "I'm going to Dr. Adams (to tell her to discontinue Medley's Glucerna)" and telling Medley, "You should have thought of that before you came in here." Byers also told Medley that she "does not meet the criteria" for a "special diet" and asked her, "How did you get on LNS in the first place?" Medley informed Byer that if she discontinued the Glucerna after having been on it for three years (and LNS for six years) her body would go into shock. Byer responded by saying, "I know."

55. That same day Medley agreed to allow Byers to take her current weight measurement. Byers brought Medley to the exam room and documented Medley's weight at 135.1 pounds. Medley had lost 10.4 pounds, which was a 7.7 percent reduction in her total body weight in just one week. Byers documented Medley's corresponding Body Mass Index ("BMI") to be 18.3, which is underweight.

56. On or about July 20, 2021, nursing staff informed Dr. Suresh Hosuru (PCP) that Medley was requesting to have Glucerna increased from 2x to 4x. Hosuru did not respond to this

request and instead, the next day, Defendant Henrey responded to the request, stating that "there [was] no data to justify an increase" of Glucerna and recommended that Medley remain at 2x, instead of 4x.

57. On or about August 6, 2021, Medley met with Defendant Hosuru. When Medley requested to renew her Glucerna 4x prescription, Hosuru declined her request and informed her that she would have to "make up" with the dieticians—referring to Defendants Byers and Henrey—because it was a "team decision." Medley informed Hosuru that she was not able to eat the regular food provided to her nor was she able to think clearly because she was not able to get enough food intake. Despite this, Hosuru still placed Medley on a calorie restriction, limiting her access to Glucerna.

58. On or about July 7, 2023, Correctional Officer Aceves sexually assaulted Medley by forcing her against a wall and "humping" her in E-Yard. At no time did Plaintiff consent to this conduct.

59. On or about September 13, 2023, Sargent Valencia and Correctional Officer Garcia assigned Medley to a cell with another inmate with a history of sexual violence. After advocating for herself, Medley was able to move cells, but correctional officers continued to threaten to place her in a cell with another inmate.

60. On or about October 2023, Medley filed an 1824 reasonable accommodation request, requesting to be moved from DD1 to DD2 status in order to receive increased protection and monitoring from the staff, citing that her Autism and ADHD increases her susceptibility to sexual exploitation outside presence of the staff. She also requested single cell status.

61. On or about November 13, 2023, the Reasonable Accommodation Panel ("RAP") denied Medley's requests. Moreover, they determined Medley would be removed from the DDP altogether. The RAP staff present included ADA Coordinator K. Petersen, Chief Physician and Surgeon G. Williams, ADA Analyst L. Bucsit, and Senior Psychologist C. Mohadjer. Medley was removed from the DDP and her DD1 status was removed. Due to her removal from the DDP, Medley has no longer receives adaptive supports and

correctional officers have threatened to put her in a double-cell, which prompts an increase in symptoms related to her PTSD and Autism.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*Excessive Force – Sexual Assault*
*(Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983)*
*Against Defendants Drey, Aceves, and Williams in their individual capacities*

62. The forgoing allegations are incorporated as if realleged herein.

63. Defendants Aceves, Drey, and Williams, acting under color of law and in the scope of each of their employment, deprived Plaintiff Medley of her constitutional rights under the Eighth Amendment, which include, but are not limited to, the right to be free from cruel and unusual punishments and the right not to be subjected to sexual assault and the unreasonable or unjustified use of force against one's person. These rights are embodied in clearly established law.

64. During all times mentioned herein, these Defendants' conduct toward Plaintiff was cruel, unusual, unjustified, unlawful, malicious, sadistic, offensive to human dignity, sexually abusive, sexually harassing, without penological justification and for Defendants' own gratification.

65. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Medley suffered and continues to suffer injuries and damages as alleged herein.

### SECOND CLAIM FOR RELIEF

*Deliberate Indifference to Serious Medical Needs*
*(Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983)*
*Against Defendants Williams, Drey, Hall, Mohadjer, Hosuru,, Byers, Henrey, Vicencio, McKenzie, and Samiinia, in their individual capacities*

66. The forgoing allegations are incorporated as if realleged herein.

67. The above-named Defendants knew of and disregarded excessive risk to Plaintiff's health and safety, in violation of her Eighth Amendment right to be free from cruel and unusual punishment.

68. Plaintiff attempted to communicate her desperation and fear for her safety to each of these Defendants as clearly as possible, yet none responded to her with sufficient care or concern for her wellbeing.

69. As a direct and legal result of Defendants' acts and omissions, Plaintiff suffered damages, including, without limitation, pain and suffering; emotional distress; attorneys' fees; costs of suit; and other pecuniary losses not yet ascertained.

70. Defendants, by engaging in the aforementioned acts or omissions, disregarded an excessive risk to Plaintiff's health and safety, thereby justifying the award of punitive and exemplary damages in an amount to be determined.

**THIRD CLAIM FOR RELIEF**

*Retaliation*

*(First and Fourteenth Amendments to US Constitution and 42 U.S.C. §1983)*

*Against Defendants Drey, Williams, Hall, and McKenzie in their individual capacities*

71. The forgoing allegations are incorporated as if realleged herein.

72. Plaintiff Medley has a right under the First Amendment to be free from retaliation from participating in protected speech activities. Defendants retaliated against Plaintiff by failing to act on her reports of sexual abuse, and instead transferring her to B-yard where she suffered the damages described above. Defendants failed to adhere to mandated PREA processes intended to prevent and identify retaliation. Defendants' retaliatory actions did not advance legitimate goals of the correctional institution.

73. Defendants' retaliatory actions caused Plaintiff to suffer harm including emotional distress, anxiety, and fear, and Plaintiff continues to suffer harm.

**FOURTH CLAIM FOR RELIEF**

*Discrimination on the Basis of Disability*

*(Americans with Disabilities Act, 42 U.S.C. §§12101, 12131, et seq. and Section 504 of the Rehabilitation Act, 29 U.S.C. §794a)*

*Against Defendants Williams, Samiinia, Vicencio, Hall, Hosuru, Peterson, Bucsit, Byers. And Mohadjer in their official capacities*

74. The forgoing allegations are incorporated as if realleged herein.

75. During all of the allegations in this case, Plaintiff was suffering from a "disability" pursuant to the American Disabilities Act ("ADA"), 42 U.S.C. §12102, given her mental and physical impairments which CDCR was aware of and had documented. As such, Plaintiff was a member of the class of persons protected by the ADA which provides that no public entity shall deny "benefits of the services, programs, or activities" to any individual "by reason of such disability." 42 U.S.C. §12132. Similarly, section 504 of the Rehabilitation Act, 29 U.S.C. §794(a), makes it unlawful for entities receiving federal funding to discriminate against an individual with a disability to deny benefits on the basis of that disability.

76. Defendants in this case discriminated against Plaintiff because of her disabilities and denied her benefits and access to public services as a result of her disabilities for the following reasons: failing to provide sufficient training to CDCR officers and staff regarding how to respond to individuals with physical and mental impairments; failing to respond reasonably to a mentally ill person who was experiencing multiple episodes of psychological distress; failing to provide reasonable accommodations for an individual with a physical impairment; and by disciplining Plaintiff for actions found by CDCR's mental health staff to be related to her mental illness and imposing a punishment found by CDCR's mental health staff to be detrimental to her mental health.

77. Defendants' acts and omissions violated both the ADA and the Rehabilitation Act, which prohibit discrimination on the basis of physical and mental disability and protect individuals like Plaintiff from the type of injuries and damages as described here.

78. As a direct and legal result of Defendants' acts and omissions, Plaintiff suffered damages, including pain and suffering, emotional distress, attorney's fees, costs of suit, and other pecuniary losses not yet ascertained.

//

//

//

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendants as follows:

a. For compensatory, general and special damages, in an amount to be determined at trial;

b. For punitive damages against individual Defendants in an amount to be proven at trial;

c. For reasonable costs of this suit and attorneys' fees; and

d. For such further relief as the Court may deem just, proper, and appropriate.

DATED: November 12, 2024

Respectfully submitted,

*/S/ Carter C. White*
Carter C. White
Attorney for Plaintiff